REINACH v. ATLANTIC & G. W. R. CO. et al.

(Circuit Court, S. D. Ohio. January, 1878.)

1. FEDERAL COURTS—JURISDICTION—CITIZENSHIP — BENEFICIARY AND HOSTILE TRUSTEE.

A suit to foreclose, brought by an alien railroad mortgage bondholder in his own right, is maintainable in a federal circuit court, although the trustee under the mortgage, who holds the legal title, is a citizen of the same state with some of the defendants; such suit being in hostility to the trustee, who refuses to act, and who is made a party defendant. Under such circumstances, the court will not look behind the parties to the record.

2. SAME—INJUNCTION—SUITS IN STATE COURTS.

A federal court has no power to enjoin a receiver in possession of a railroad under appointment of a state court from issuing receiver's certificates, or to restrain the parties in the state court from carrying out an agreement sanctioned by that court. Rev. St. § 720.

3. JUDGMENT — COLLATERAL ATTACK — JURISDICTIONAL AND QUASI JURISDICTIONAL FACTS.

There is a clear distinction between those facts which involve the jurisdiction of the court over the parties and the subject-matter, and those

quasi jurisdictional facts, without allegation of which the court cannot be set in motion, and without proof of which a decree should not be pronounced. In the absence of the former the judgment of the court is void, and may.be attacked in collateral proceedings, while in respect to the latter it is conclusive, and cannot be questioned except on review. ·

4. SAME—STATE AND FEDERAL COURTS.

In a suit in a state court to foreclose a railroad mortgage, the trustees in a prior mortgage of a portion of the property filed a cross bill, claiming priority. Thereupon a committee appointed for the purposes of a former litigation by holders of the bonds secured by such prior mortgage entered into a contract postponing payment thereof, subject to approval of the court. The nature of the committee's appointment was brought to the attention of the court, but it confirmed and proceeded to carry out the contract for extension. *Held* that, as the court had jurisdiction of the subject-matter and the parties, the question of the committee's authority was only quasi jurisdictional, and the court's decision thereof was conclusive, so that a federal court could not question the proceedings based thereon in a collateral proceeding brought by a bondholder who was a party to the contract appointing the committee. Such bondholder's remedy was by appeal from the decree of the state court.

In Equity. On motion for an injunction. Denied.
Statement by BROWN, District Judge.

This was a bill to foreclose a mortgage made on the 1st day of October, 1855, by the Atlantic & Great Western Railroad Company, to Flagg and Stedman, to secure the issue of $4,000,000 of bonds, payable 21 years from date, i. e. on the 1st day of October, 1876. About $2,500,000 of such bonds were alleged to be outstanding. The complainant, who is an alien, alleges to own $15,000 of the same.

The defendants Schuchardt and Meyer were the successors of Flagg and Stedman as trustees under this mortgage, which was commonly known as the "Ohio Mortgage."

The railroad company subsequently made a second mortgage to John R. Penn, trustee, to secure $18,485,000 of bonds to be issued thereunder. On such second mortgage, foreclosure proceedings were instituted in the court of common pleas for the county of Summit, in the state of Ohio, and under the decree entered therein in April, 1869, the mortgaged property was sold, subject, however, to the lien of the first or Ohio mortgage. The complainant alleges that the defendant Schuchardt and his then cotrustee, Flagg, filed in such foreclosure suit a cross bill or petition praying, inter alia, that the road might be sold, and the proceeds used in paying the principal and interest of the bonds represented by them; that the court, however, refused so to adjudge.

By the decree in the Penn foreclosure suit, it was, among other things, provided, that any purchaser under the decree should purchase the property subject to the lien of the said Ohio mortgage, and to the rights of its trustees, and, as declared in said decree, that if default were made in the payment of the principal of the bonds secured by said Ohio mortgage when the same became due, and such default should continue for 10 days thereafter, leave was thereby "given to the said Flagg and Schuchardt, or their successors in said trust, to apply to this court, or to one of the judges thereof in vacation, upon notice in writing to said Upson and Penn, or their successors in their respective trust, * * * for an order directing the clerk of this court to issue an order upon this judgment, and sell the said premises, property, and franchises covered by said mortgage to said Flagg and Stedman, * * * together with the subsequently acquired property." Such decree also authorized the court or judge to grant such order, and to direct an order of sale to issue upon the praecipe of said Flagg or Schuchardt, or their successors in trust, if it should be satisfactorily proven that such default had been made and continued.

On the institution of the Penn foreclosure suit, a large body of the owners of the bonds under the Ohio mortgage, who resided in Europe, for the purpose of protecting their interests in said suit, and in order to realize the

money due on their bonds, (which, the complainant alleges, were then supposed to be due by reason of the nonpayment of interest thereon,) associated themselves together, and constituted the firm of Wertheim & Gompertz and Frederick W. Oewel, all bankers in Amsterdam, as their agents for the purpose of representing them in the said suit, and of enforcing their rights under said bonds. A copy of the agreement so entered into was annexed to the bill.

It provided, among other things, that the holders of the bonds should surrender them to their said agents, and that they were to issue certificates therefor, and such bonds were to remain in the custody of the persons designated therein.

The complainant surrendered his bonds under said agreement, and received a certificate therefor.

The decree in the Penn foreclosure suit, adjudging that the principal of the Ohio mortgage had not become due, was claimed to have terminated the agreement, and the purposes for which it was entered into, although the owners of the bonds thereafter left the same in the custody of the said agents, who collected and remitted the interest thereon.

The purchasers under the Penn decree subsequently became the Atlantic & Great Western Railroad Company, and thereafter said company made another mortgage to the defendants Taylor and Dunphy, as trustees, and issued thereunder a large number of bonds, amounting to upwards of $56,000,000. The company, shortly after the issuing of said bonds, became financially embarrassed; and thereupon, in 1874, the defendants Taylor and Dunphy commenced a suit in the common pleas of Summit county for the foreclosure of such mortgage, in which Schuchardt and Meyer intervened and filed a cross petition. In such suit the defendant Devereux was appointed receiver, and an order was made permitting the receiver to issue receiver's certificates for the running and other expenses of the road, which, it was conceded in the bill filed by Taylor and Dunphy, could not be paid from the earnings of the road. The order likewise provided that the receiver's certificates should take precedence of the lien created by the Ohio mortgage, under which Meyer and Schuchardt were then the acting trustees. Complainant alleges that instead of proceeding to the foreclosure of the Ohio mortgage when the same became due, or exercising the right conferred on them by the decree in the Penn suit, Meyer and Schuchardt consented to the other defendants procuring an order from the court in Summit county confirming an alleged contract for the extension of the payment of the principal of the Ohio mortgage for three years from its maturity. Such contract purported to be entered into by Wertheim & Gompertz and Oewel, claiming to represent a majority of the Ohio bondholders, and a committee on the part of subsequent lienors and of stockholders, the purport and result of which, it is claimed, would be to extend the time of payment of the principal due on the Ohio mortgage for three years; to permit the receiver, Devereux, during such three years, to remain in possession, and to create a prior lien to such first mortgage by the continued issuance of receiver's certificates for money necessary to be borrowed to pay the interest on the Ohio mortgage during such additional three years. The defendants Taylor and Dunphy, as such trustees and plaintiffs, petitioned the Summit county court to confirm such contract, and the defendants Schuchardt and Meyer represented to the court that a large majority of bondholders under the Ohio mortgage approved such contemplated contract; that a minority did not approve; but that they thought the contract would be for the benefit of the cestuis que trustent,—and submitted the entire matter to the consideration of the court. It was not shown to the said court that any of the bondholders had personally approved or ratified such contract, but its alleged ratification or approval consisted in its execution by Wertheim & Gompertz and Oewel, by an alleged attorney. The only authority in the premises possessed by Wertheim, Gompertz, and Oewel was derived from the agreement, which was called to the attention of the Summit county court. One Von Langen appeared, and objected to said extension of the mortgage, and called upon Meyer and Schuchardt to collect the principal due on the mortgage, which they refused to do.

The defendant Schuchardt, after the maturity of the mortgage, resigned his position as trustee by a letter of resignation addressed to the Atlantic &

Great Western Railroad Company, and by it accepted. The complainant averred that such alleged resignation was nugatory, and could not legally be effected in such manner, and that the defendant Schuchardt was still one of the trustees under said mortgage.

The complainant alleges that other bondholders, similarly situated, applied to the Summit county court for leave to intervene, and to be heard in opposition to the confirmation of said alleged contract; that their right in that respect was opposed by all the defendants, including the defendant Meyer, claiming that the application for the confirmation of said alleged contract was purely ex parte, and that he (Meyer) represented all the bondholders, and that they therefore had no right to intervene; that the court accepted such view, and declined to admit said dissenting bondholders to such suit. Complainant thereupon filed his bill in this court, and prayed:

(1) That the mortgage might be foreclosed, the property sold, and the moneys arising from the sale brought into court, to be distributed to the parties entitled thereto.

(2) That during the pendency of this suit the said Devereux, or some other fit and proper person, might be appointed receiver of the property covered by the said mortgage.

(3) That the said Devereux might be restrained from issuing any receiver's certificates, which should take precedence of the lien of the said mortgage; that the said Meyer might be decreed to deliver to complainant the said bonds so deposited by him under the said agreement with the Amsterdam bankers; and that, in default of his so doing, complainant might have the same relief upon the said certificate as if the said bonds represented thereby were produced by the said Meyer.

(4) That this court might prohibit the execution of any agreement by any party defendant whereby the time of payment of the said mortgage, or of the bonds issued thereunder, should be postponed, enlarged, or in any way prolonged.

(5) That any such agreement, if executed, might be set aside. and declared to be illegal and void.

(6) That complainant might have such other relief, or such further and different relief, as should be just and equitable.

Charles M. Da Costa and Stanley Matthews, for complainant.
Mr. Adams, for defendant Meyer.
R. P. Ranney, for Taylor and Dunphy.
Durbin Ward, for Devereux, receiver.

Before SWING and BROWN, District Judges.

BROWN, District Judge, (orally, after stating the facts.) Entertaining, as we do, no serious doubts as to what our conclusion in this case ought to be, we have determined to dispose of it while the facts are fresh in our minds, and while the counsel who argued the case are present in court, although the limited time we have had for the examination of authorities will prevent that extended review of the facts and the law of the case which its importance, and the ability with which it was argued, invite.

1. The first defense made to this bill is that this court has no jurisdiction, inasmuch as the trustee who holds the legal title to the bonds is a citizen of the same state as several of the defendants. It appears, however, that the plaintiff, who is a bondholder under Mr. Meyer, trustee, is an alien,—a citizen of the republic of France; that the Atlantic & Great Western Railroad Company and Mr. Devereux, the receiver, are citizens of Ohio, though the latter is a resident of the northern district; that Schuchardt, Meyer, and

Dunphy are citizens of New York; and Taylor, a citizen of New Jersey.  Under these circumstances, so far as the question of citizenship is concerned, we think the court has full jurisdiction of the case.

There is, undoubtedly, a class of cases which hold that, where an action is prosecuted by a merely nominal plaintiff,—a person who, by law or statute, is made a necessary plaintiff,—the jurisdiction of the court is to be determined by the real parties to the action; but we believe this doctrine is confined to that class of cases of which Brown v. Strode, 5 Cranch, 303, is the earliest example. This was an action upon an executor's bond, given to justices of the peace, in conformity with a statute of Virginia.  The object of the suit was to recover a debt due from the testator, in his lifetime, to a British subject.  The defendant being a citizen of Virginia, the court held it had jurisdiction of the case.

A somewhat similar case was that of McNutt v. Bland, 2 How. 10.  This was an action on a bond given by a sheriff of a county in Mississippi to the governor of the state, and was prosecuted in the name of the governor for the use of citizens of New York.  Upon demurrer it was held that the circuit court had jurisdiction.  "In this case," said the court, "there is a controversy and suit between citizens of New York and Mississippi; there is neither between the governor and the defendants; as an instrument of the state law to afford a remedy against the sheriff and his sureties, his name is on the bond, and to the suit upon it, but in no just view of the constitution or law can he be considered as a litigant party.  *  *  * Where the real and only controversy is between citizens of different states, or an alien and a citizen, and the plaintiff is, by some positive law compelled to use the name of a public officer, who has not, or ever had, any interest in or control over it, the courts will not consider any others as parties to the suit than the persons between whom the litigation before them exists."

The case of Irvine v. Lowry, 14 Pet. 293, draws clearly the distinction between the cases where the court can, and where it cannot, take jurisdiction.  This suit was brought upon a promissory note against the defendant, the maker of the note, who was a citizen of the state of New York, by the plaintiff, the payee of the note, who was a citizen of Pennsylvania, for the use and benefit of a certain bank, part of the stockholders of which were also citizens of New York.  The court observed:

"Nothing then remains but to ascertain from the record, as certified, whether the bank is the real plaintiff, for, if they are not, then, as Irvine is admitted to be a citizen of Pennsylvania, and Lowry, of New York, the jurisdiction is undoubted.  The paper upon which the suit is brought is not negotiable by the usage or custom of merchants. * * * The bank, therefore, cannot sue in their own name, in virtue of the indorsement of Irvine in blank, nor could they so sue it if it were specially indorsed to them, because the legal right of action would still remain in Irvine, though the equitable interest in the thing promised may have passed to the bank. * * * Standing as such to the bank, their rights are derivative through him, and as the indorsement passes only an equity the legal interest is in him.  He is the real plaintiff in a court of law, in which the legal rights alone can be recognized."

The court then proceeds to draw the distinction between this and the case of Brown v. Strode, where the jurisdiction of the circuit court was sustained on the ground that, though the plaintiffs and defendants were citizens of the same state, the former were merely nominal parties, without any interest or responsibility, and made by the law of Virginia the mere instruments or conduits through whom the legal right of the real plaintiff could be asserted.

The case of Coal Co. v. Blatchford, 11 Wall. 172, relied upon by the defendant, is no authority for the dismissal of this bill. This was a bill brought by trustees to foreclose a mortgage upon the property of a railroad and coal company. The defendant demurred to the bill on the ground that one of the plaintiffs and the defendant corporation being citizens of the same state, the court had not jurisdiction of the case. The demurrer was sustained upon the authority of Chappedelaine v. Dechnaux, 4 Cranch, 307; Childress v. Emory, 8 Wheat. 669, and Osborn v. Bank, 9 Wheat. 738. To the same effect is the case of Knapp v. Railroad Co., 20 Wall. 117. As the cause of action was vested in the plaintiff in this case as trustee under the mortgages, the court looked upon their citizenship in determining the question of jurisdiction, and not to the residence of those persons who were beneficiaries in the subject-matter of the litigation.

It does not, however, follow that, where the cestui que trust is himself the complainant, the jurisdiction of the court will be ousted by the citizenship of his trustee. In the case under consideration, the suit is brought by a single bondholder in his own right. It is prosecuted, not under the trustees, but in hostility to them, and the trustees are made parties defendant. The plaintiff does not claim under them, in any sense, except that they hold the legal title, but he does as he may rightly do if a trustee has died, or has betrayed or refused to execute his trust,—prosecute the suit in his own name. Railroad Co. v. Cowdrey, 11 Wall. 459; Alexander v. Railroad Co., 3 Dill. 487.

Although a deceased party may have been a citizen of the same state with the defendant, his executor is regarded as the party to the record, and except in a case where the party is a merely nominal plaintiff for the use of the real plaintiff, and, perhaps we may add, a plaintiff made such by statute, we know of no case where the court will look behind the parties to the record. It follows that this point is not well taken.

2. The second and more serious defense is that this court has no jurisdiction on account of the pendency of a suit in the court of common pleas of Summit county for the foreclosure of a subsequent mortgage, to which suit the trustees of this mortgage were made parties under the practice in this state, and in which certain dissenting bondholders have petitioned to be heard. In this suit a receiver has been appointed, and is in possession of the road, and it is claimed that this court has no jurisdiction to interfere in any way with that receiver, or to enjoin him from contracting debts which that court has held he might contract; that the state court has full and complete jurisdiction and control over the entire sub-

ject-matter, and over the issues before it.  In order to appreciate fully this claim, it will be necessary to rehearse to some extent the facts connected with the original mortgage now sought to be foreclosed.  It was made in October, 1855, a few days after the organization of the company, to Flagg and Stedman, trustees, who have been since superseded by Schuchardt and Meyer, of whom Schuchardt has resigned his trust, leaving Meyer sole trustee.  About the same time, another mortgage was executed to one Penn for some $18,000,000.  Default having been made by the railroad company upon the coupons annexed to the Penn mortgage, a bill was filed in the court of common pleas of Summit county for the foreclosure of this mortgage, to which the trustee under the present mortgage was made a party, as was required by the practice in this state.  He was then not only a proper, but a necessary, party to this suit.  He filed his answer, and also a cross-bill setting up the prior rights of bondholders under the Ohio mortgage.  On the institution of this foreclosure, however, a large body of the bondholders who are residents of Holland, for the purpose of protecting their interests, and in order to realize the money due upon their bonds, which they then supposed was due, associated themselves together, and constituted a firm of Amsterdam bankers their agents for the purpose of representing them in such suit, and of collecting the amount due upon their bonds.  A copy of this agreement, known as the "Amsterdam Contract," is made a part of the bill, and reference will be had to it hereafter.  The plaintiff was a party to that agreement,—became such by depositing his bonds with those bankers,—and the agreement is so far binding upon him that he is estopped from taking any action inconsistent with the authority he had given them.  The road was reorganized after having been sold on the Penn decree, October 3, 1871, subject to the Ohio mortgage, and a new mortgage was given, for $56,000,000, to Taylor and Dunphy, as trustees.  Much comment has been made by counsel upon the enormous difference between the mortgages of eighteen and fifty-six million dollars.  It should be remembered, however, that the road was reorganized, and consolidated with other roads; that large expenses were incurred; and it is but natural that the mortgage should have been increased.  It seems to us a matter we have no right to look into, in any view of this case.  The charge of fraud is fully denied by the answer, as we understand it; and, being so denied, the answer, for the purposes of this motion, must be taken as true.  Suit was brought to foreclose the Taylor and Dunphy mortgage in 1874 for nonpayment of the coupons, to which Meyer, surviving trustee of the Ohio first mortgage, was made a party.  He filed his cross bill, as had been done by the trustees under this mortgage in the previous suit, and again set up his priority of lien.  An agreement was thereupon entered into between the Amsterdam bankers, on the one part, representing the bonds under the Ohio first mortgage, and a committee of English bondholders under the second Penn mortgage, bearing date September 30, 1876, by which it was agreed the Dutch bondholders should be postponed in the payment of their mortgage for three years.  At least the purpose

and result of it would be to extend the time of payment on their part for three years.

No question is made here of the power of the English committee to make that contract on behalf of the bondholders under the second mortgage. The Dutch bankers assumed, undoubtedly, to sign it upon the faith of the power given to them by what is known as the "Amsterdam Agreement" between themselves and bondholders representing about nine-tenths of the entire amount of the bonds under the Ohio first mortgage. Whether the Amsterdam agreement did give this authority or not, is a question open to doubt. It was strenuously insisted upon the argument that it did not. The substance of the agreement is as follows: After reciting "that, for a long time past, the coupons of these bonds are in default; that a number of holders of such defaulted coupons have handed the same to the deponent, Oewel, to enforce against the said company the rights that appertain to the holders of such coupons and bonds; that, consequent upon advices received from America, it becomes necessary, in order to enforce such rights, to have the bonds there for submission to the court, or to produce and use them in the legal proceedings that may arise,"—it provides:

"Art. 5. The deponent, Oewel, is authorized, by the surrender of the bonds, to enforce, in his name, or in the name of the party he appoints in America, all the rights and claims which the ownership of the surrendered bonds imply, and to institute all suits and measures which he may deem necessary. He is likewise authorized to compromise about these rights, claims, or the payment thereof. He is to intrust the proceedings, and the framing and the execution of all necessary measures, to such persons in New York, and wherever else it may be necessary, as he may consider most fit."

"Art. 7. The holder of a certificate cannot reclaim the bonds against which it was issued until the proceedings which Mr. Oewel shall have instituted on the strength of its delivery shall have been concluded.

"Art. 8. The moment the proceedings referred to in the preceding article shall be brought to an end, the holder of a certificate will, on delivery of same, receive from Messrs. Wertheim and Gompertz and Oewel, jointly, (after deduction of his proportionate share of the expenses,) all that they may have on hand, as corresponding to the bond against which the certificate was issued."

It is not unusual, in cases of railway mortgages, where the bondholders are very numerous, to employ a committee to act for them. Indeed, it is obviously impossible that so large a number of bondholders, residing so far distant from the subject-matter of litigation, should be able, personally, to superintend the collection of the coupons, or the legal proceedings that may arise in connection with them. The prime object of this agreement was evidently to secure co-operation among the bondholders; to appoint an agent, who should see to the collection and enforcement of these bonds, and the foreclosure of this mortgage. It is claimed that, while this agreement did give the Amsterdam bankers authority to transact their business connected with the suit then pending, after the termination of that suit the agreement became functus officio; that these parties ceased to be the agents of the bondholders in any further litigation; that they had no right, in the suit of 1874, brought some five years after the first one, to com-

promise in any way the rights of the bondholders; that their action in signing the Dutch-English agreement for the extension was ultra vires; that it gave no right to the trustees or the court to approve it; and that the decree of the court was itself ultra vires and void. Though it does not become necessary to decide that question, we are inclined to the opinion that considering the general scope and purpose of this contract, and the object for which these bonds were placed in the hands of these bankers, their authority continued until the bonds were collected; at least, in the absence of any redelivery of the bonds to the bondholders, or of any attempt on their part to reclaim or to put an end to their contract. As a matter of fact, the bonds were intrusted to them, and were sent to America, and placed in the hands of American counsel. They were, after the termination of the suit, returned to the Amsterdam bankers, but have never been returned to the bondholders themselves. The bankers continued to collect the coupons, and to see that the interests of the bondholders were protected. They acquired, as it is claimed, by large expenditures made by them, an interest themselves in the execution of this trust; and, if they did not continue to hold the bonds under this contract, it is not easy to see under what contract they did hold them. Clearly, they held them for the benefit of the bondholders. They were continuing to collect the coupons, and pay the interest over to the owners, and, so far as it appears, no dissent had been expressed to their continuing to hold them; and, the main object of the contract being to appoint an agent for the collection of the bonds, it would seem as though the authority of these parties continued until the bonds were actually collected. If the mortgage securing these bonds was foreclosed by the decree pronounced in the Penn suit in 1869, then there is no mortgage to foreclose here. It is already merged in the Penn decree. If that mortgage was not, however, merged in that decree, then, at least, it is an open question whether the second suit and the cross bill of Schuchardt and Meyer is not a continuance of the original proceedings, although filed in the suit for the foreclosure of another, namely, the Taylor and Dunphy mortgage. While it may not be, perhaps, the same suit, or a continuance of the same suit, still it is a continuation of the proceedings originally instituted to enforce payment of this mortgage. And, if it were our duty to determine what construction we should give to this contract, we should hesitate very long before saying that the Dutch bankers were not authorized by it to execute this Dutch-English contract, extending the time for payment. They undoubtedly assumed to make this contract upon the faith of the Amsterdam agreement, which was called to the attention of the court. The contract itself was laid before the trustees, the legal holders of the mortgage, who approved it. It was also made subject to the approval of the court, which did in fact confirm it.

We have very serious doubts as to the power of these trustees, as against dissenting bondholders, to waive their right to an im-

mediate foreclosure, and to grant an extension of three years, and we consider it at least open to question whether the supreme court, upon writ of error, would not hold that such action impaired the obligation of the original mortgage. We do not deem it necessary, however, to pass upon this question. There is no dissenting bondholder before this court. The only party here is one who claims to hold certificates from Wertheim & Gompertz, and is bound by their agreement, if they had power to bind any one. Whether this Amsterdam contract gave to them the power claimed,—to sign the Dutch-English contract,—and the trustees the right to approve it, and the court to carry it out by authorizing the receiver to contract debts for the current expenses of the road, and to issue certificates therefor, which should take precedence of the Ohio mortgage, was a matter before the state court. It had full jurisdiction of the subject-matter, namely, the property in controversy. All parties to the case—not only those to the original bill, but the trustees under the first mortgage, who filed their cross bill—were before that court, which had full and complete jurisdiction of the case; and, having such jurisdiction, we hold that its action is binding.

The court having decided these questions, and having inferentially, if not directly, held that the Amsterdam agreement did authorize the Dutch bankers to sign the Dutch-English contract, and the trustees to approve it, we feel quite clear that we are concluded, so far as this case is concerned, by that decree. Mr. Von Langen, who represented the dissenting bondholders, appeared in the state court, and asked to be made a party to the proceeding. The court refused it. We have no right to criticise this refusal. His remedy is by invoking the action of a superior court. It was certainly not a matter of discretion to refuse him an appearance, and it must, in some way, be reviewable by the supreme court of this state, by writ of error, appeal, or mandamus. If Mr. Reinach, the plaintiff in this suit, had applied to that court, and been refused a hearing, we should have felt concluded by its decree. We cannot review the action of the state court in that particular. Notwithstanding the Summit county court may not, as it is claimed by counsel for the plaintiff, have had jurisdiction to enforce this contract, still the court itself determined that it had jurisdiction, and we understand the rule to be that, where there is jurisdiction of the parties and of the subject-matter, the court may then pass upon its own jurisdiction, and its judgment upon that point is final and absolute.

There is a clear distinction between those facts which involve the jurisdiction of the court over the parties and the subject-matter and those quasi jurisdictional facts without allegation of which the court cannot be set in motion, and without proof of which a decree should not be pronounced. The judgment of a court having no jurisdiction of the subject-matter or the parties is null and void, and may be impeached in collateral proceedings, and the record of the court showing such jurisdiction may be contradicted by parol evidence.

Galpin v. Page, 18 Wall. 350; Starbuck v. Murray, 5 Wend. 148; Williamson v. Berry, 8 How. 495; Thompson v. Whitman, 18 Wall. 457; Knowles v. Gaslight & Coke Co., 19 Wall. 58.

But there are certain facts termed "quasi jurisdictional" which must be alleged and proved, but, when so proved, are res adjudicata and binding in collateral proceedings. Such, for example, as that, in a petition for letters of administration, the decedent left no will; in informations in rem under the revenue laws, that the property has been seized by the collector; and, in proceedings to sell real estate for the payment of debts, that the deceased left no sufficient personalty. Examples of these litigations, and of the conclusive character of the judgments rendered under them, are found in the following cases: Hudson v. Guestier, 6 Cranch. 281; Thompson v. Tolmie, 2 Pet. 157; Ex parte Watkins, 3 Pet. 193; Grignon's Lessee v. Astor, 2 How. 319; U. S. v. Arredondo, 6 Pet. 709; Griffith v. Bogert, 18 How. 158; Beauregard v. New Orleans, Id. 497; Florentine v. Barton, 2 Wall. 210; Comstock v. Crawford, 3 Wall. 396; Segee v. Thomas, 3 Blatchf. 11; Sheldon v. Wright, 5 N. Y. 497; Dyckman v. Mayor, Id. 434; Jackson v. Crawfords, 12 Wend. 533; Jackson v. Robinson, 4 Wend. 436; Wright v. Douglass, 10 Barb. 97; Fisher v. Bassett, 9 Leigh, 119, 131.

So, in proceedings in involuntary bankruptcy, the allegation with regard to the debt of the petitioning creditor is treated as jurisdictional, and the judgment of the district court is binding, in an action by the assignee. Michaels v. Post, 21 Wall. 398; Betts v. Bagley, 12 Pick. 572.

Even if the determination of the court with regard to the power given to the Amsterdam bankers to sign the Dutch-English contract involved a jurisdictional question, which we are by no means disposed to concede, it was clearly of that character which cannot be reviewed here in a collateral proceeding. Its error in that regard could not be made the foundation of a suit here.

We are asked, in this case, not only to foreclose a mortgage which is in process of foreclosure in the state court, but to appoint a receiver of the property covered by the mortgage, without power to deliver him possession, possession having been already obtained by a receiver of the state court. The decree of the state court, postponing a sale, may at any time be reversed and a sale of the property ordered under the first mortgage. Of what avail, then, would it be for us to decree a sale of the same property? Ought this court to go through the idle form of a sale, without the power to deliver possession to the purchaser?

We are also asked to restrain the receiver of the state court from issuing certificates in obedience to the power given by that court; to prohibit the execution of an agreement made by a party defendant in a state court, which has already been executed and carried into effect by that court; and to set aside such agreement, if already made, as illegal and void.

By the Revised Statutes, (section 720,) we are prohibited from granting injunctions to stay proceedings in any court of a state, except in cases where such injunction may be authorized by any

law relating to proceedings in bankruptcy. We see no reason why this section is not fully applicable here. It is held to extend, not only to the officers of the state court, but to the parties litigant there. So far as we know, the decisions have been uniform that the federal and state courts are so far independent of each other that injunctions will not be granted by either against the officers or the parties litigant in the other, staying proceedings in such courts. Diggs v. Wolcott, 4 Cranch, 179; Peck v. Jenness, 7 How. 612. In this case it is said, (pages 624, 625:)

"It is a doctrine of law too long established to require a citation of authorities that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause; and, whether its decision be correct or otherwise, its judgment, till reversed, is regarded as binding in every other court; and that where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. * * * The fact, therefore, that an injunction issues only to the parties before the court, and not to the court, is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum."

Riggs v. Johnson Co., 6 Wall. 166:

"Circuit courts and state courts act separately, and independently of each other; and, in their respective spheres of action, the process issued by the one is as far beyond the reach of the other as if the line of division between them was traced by landmarks and monuments visible to the eye."

U. S. v. Council of Keokuk, 6 Wall. 514; Duncan v. Darst, 1 How. 301; McKim v. Voorhies, 7 Cranch, 279; Watson v. Jones, 13 Wall. 719; City Bank v. Skelton, 2 Blatchf. 14, 28; Memphis City v. Dean, 8 Wall. 64; Mallett v. Dexter, 1 Curt. 178; Parsons v. Lyman, 5 Blatchf. 170; Peale v. Phipps, 14 How. 368; Bell v. Trust Co., 1 Biss. 260, and cases page 274; Union Trust Co. v. Rockford, etc., R. Co., 6 Biss. 197.

It is also a doctrine too familiar for extended comment that property in the possession of a court acting under one jurisdiction cannot be wrested from it by an officer acting under another jurisdiction. Taylor v. Carryl, 20 How. 583; Freeman v. Howe, 24 How. 450; Buck v. Colbath, 3 Wall. 334; Keating v. Spink, 3 Ohio St. 105.

The rights of the parties in this suit are protected in a state court. Whether fully protected or not is not for us to determine. We cannot say here that the action of the state court in confirming an agreement for the extension of the first mortgage has been injudicious. There are many reasons for saying it has been a judicious action. Great difficulties are suggested in the way of an immediate foreclosure under the first mortgage, which covers, it seems, only a part of the road, and a fraction of 347-388 of the lease of a branch line represented to be the most valuable feature of the organization. To say that the rights of this complainant are not fully protected in the state court; to pronounce that there is collusion and fraud there; and to demand of us, virtually, to stop the progress of this suit, and to sweep the subject-matter of the litigation and the contentions of these parties within the jurisdiction of this court,—is requiring of us more, we believe, than has ever been granted in any court of the United States.

We cannot better conclude this opinion than by the following quotation from the decision of Mr. Justice Bradley in Haines v. Carpenter, 91 U. S. 254:

"A mere statement of the bill is sufficient to show it cannot be sustained. * * * In the first place, the great object of the suit is to enjoin and stop litigation in the state courts, and to bring all the litigated questions before the circuit court. This is one of the things which the federal courts are expressly prohibited from doing. By the act of March 2, 1793, it was declared that a writ of injunction shall not be granted to stay proceedings in a state court. * * * This objection, alone, is sufficient ground for sustaining the demurrer to the bill. * * * The state courts have full and ample jurisdiction of the cases, and no sufficient reason appears for interfering with their proceedings."

See, also, Wilmer v. Railroad Co., 2 Woods, 409.

The motion for an injunction must be denied.